FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

------------------------------------------------------------x
                                :

VALERO MARKETING & SUPPLY COMPANY  :

       Plaintiff,               :         Civ. No. 01-5254 (DRD)

             v.              :

                                :         <u>OPINION</u>

GREENI OY & GREENI TRADING OY      :

       Defendants             :

                                :
------------------------------------------------------------x

James A. Saville, Esq.
HILL, RIVKINS & HAYDEN, LLP
51 Newark Street
Suite 404
Hoboken, New Jersey 07030-4543

       Attorneys for Plaintiff

Charles Carnicas, Esq.
VEDDER, PRICE, KAUFMAN & KAMMHOLZ
Five Becker Farm Road
Roseland, New Jersey 07068

       Attorneys for Defendants

**<u>DEBEVOISE, Senior District Judge</u>**

       This matter is before the Court on Plaintiff's, Valero Marketing & Supply Company

("Valero"), motion for partial summary judgment against Defendants, Greeni Oy and Greeni

Trading Oy (together "Greeni"), for breach of contract.  Valero is a corporation incorporated in the State of Delaware with its principal place of business in San Antonio, Texas.  It is engaged in the business of blending components purchased from third parties into reformulated gasoline. Greeni Trading is a corporation incorporated in Finland with its principal place of business in Helsinki, Finland.  It is engaged in the business of buying and selling petroleum products and chartering oceangoing vessels.

Valero's Complaint alleges that it suffered substantial loss resulting from Greeni's failure to deliver to it, within a certain delivery window, naphtha[1] for which it had contracted.  Valero contends it is entitled to partial summary judgment on the issue of Greeni's liability.  It contends that Greeni is liable for the losses it suffered because it was unable to blend the naphtha with other components into reformulated gasoline for delivery into the cash market before September 30, 2001.

## I. Background

### A. Valero's Relationship with Greeni

In early August 2001, Ilkka Kokko, a petroleum trader and one of two owners of Greeni Trading, contacted its cargo broker, Cees van der Hout of Starsupply Petroleum Feedstocks, Inc. ("Starsupply")[2], to advise him of the availability of a quantity of naphtha which Greeni owned and was interested in selling.  Van der Hout undertook the task of selling Greeni's naphtha.

---

[1] Naptha is a colorless, volatile petroleum distillate, usually an intermediate product between gasoline and benzine, used as a solvent, fuel.

[2] Starsupply's principal place of business is in New Jersey, and it is engaged in the business of brokering sales and purchases of petroleum products, including naphtha.

2

Among the individuals van der Hout contacted was Stuart Burt, the trader responsible for

Valero's blending operation in Perth Amboy, New Jersey.  On or about August 15, 2001, Valero,

as buyer, and Greeni, as seller, entered into a contract, orally through van der Hout (Greeni's

standard practice), for the delivery of 25,000 metric tons ("mt") of naphtha to Valero's shore

tanks in New York Harbor[3].

B.  <u>The Contract Terms</u>

Greeni agreed to sell and Valero agreed to buy 25,000mt of naphtha to be delivered

between September 10-20, 2001.  At the time the deal was reached, the naphtha was in stock at

Hamburg, Germany and was owned by Greeni.  On the same day the oral agreement was

reached, van der Hout faxed a written confirmation of the deal to Burt and Kokko.  The

confirmation detailed the deal in terms of, *inter alia*, product, quantity, quality, timing of delivery

and pricing, the fact that the vessel on which the naphtha would be shipped was subject to

inspection and approval by Valero's Transportation Group and that title and risk of loss or

damage to the naphtha would remain with Greeni throughout the voyage and until the product

passed at the flange connection between the vessel's manifold connection and the shore line at

the discharge port, New York Harbor.  The confirmation also provided that English law and

arbitration would govern the contract, a term to which Valero did not object or affirmatively

agree to.  On or about August 17, 2001, Valero sent to Greeni a written confirmation.  Valero's

written confirmation contained similar provisions to Greeni's, but stated that New York law and

---

[3] Valero's shore tanks in New York Harbor are located at the Stolhaven Terminal in
Perth Amboy, New Jersey.

jurisdiction would apply.  Greeni did not object or agree to the terms contained in Valero's confirmation.

Greeni enlisted its ship brokers to locate a vessel to transport the naphtha and shortly thereafter located the Bear G.  On or about August 22, 2001, Kokko fixed the Bear G subject to charterer's approval, a subject that was set to expire on August 29, 2001.  Greeni lifted the subjects to the Bear G on August 29, 2001, prior to nominating the vessel to Valero.  On or about August 30, 2001, Greeni nominated the Bear G to Valero.  The same day, upon receipt of Greeni's nomination, Lawrence Smith, of Valero's Transportation Group, rejected the nomination of the Bear G. Valero's reason for rejecting the Bear G was that it did not meet Valero's criteria for acceptance.  Smith's review of the vessel was based on his knowledge of the vessel's history and a review of relevant reports, including a report on the Bear G made available by the Oil Companies International Marine Forum ("ILIMF").  The report stated that on November 16, 2000, the Bear G entered the Port of New York with fuel oil leaking into the ship's ballast tanks.  The report also stated that the United States Coast Guard found that oxygen levels in the ballast tanks were not adequate, that a stripping line to the No. 8 cargo tank had failed and that the forward firefighting station was not adequate.  Van der Hout relayed Valero's rejection of the Bear G to Kokko.  Despite Valero's rejection Greeni decided to use the Bear G to transport the naphtha, noting that Valero had accepted the vessel on a recent transaction with Greeni[4].

_____

[4] Prior to entering into the agreement for the sale of naphtha, in or about early August 2001, Greeni and Valero entered into negotiations for the sale by Greeni to Valero of a petrochemical product, vacuum gas oil ("VGO").  The VGO was to be transported from Europe to Valero's facilities in Corpus Christi, Texas.  In connection with the VGO transaction, Greeni

The Bear G completed loading and sailed from Hamburg, Germany on September 10, 2001 (the first day of the contractual delivery window).  On September 14, 2001, a second agreement was reached, under which Valero would accept delivery of the naphtha via barges (from the Bear G to Valero's dock) at Greeni's risk and expense.[5]  The agreement also stipulated that Valero would accept naphtha delivered to it before September 20, 2001 at the full contract price and that it would accept, at a discounted price, naphtha delivered to it between September 20-24, 2001.

The Bear G arrived in New York Harbor at 3:30 a.m. on September 22, 2001, 27 ½ hours after the contractual delivery date of September 20, 2001.  Greeni contends the Bear G's voyage was affected by Hurricane Gabrielle in the North Atlantic and the delivery of the naphtha was affected by the September 11, 2001 terrorist attacks in the United States.  Upon the Bear G's arrival, Valero refused to permit the Bear G to unload the naphtha cargo directly to its tanks at Stolhaven Terminal.[6]  Greeni then discharged its cargo to the barges of the other receivers to whom it had sold the naphtha.  Greeni did not deliver any naphtha to Valero by September 20, 2001 or by September 24, 2001.

_____

nominated the Bear G to transport the VGO to Valero's Texas facilities and Valero accepted the nomination of the Bear G.

[5] Initially, after agreeing to delivery of the naphtha via barges from the Bear G, Valero offered to aid Greeni in securing the barges, but Valero ultimately found that it was not able to provide this assistance.

[6] Greeni cites the World Trade Center attack of September 11, 2001 as the reason for its inability to charter barges by September 24, 2001.

II. <u>Discussion</u>

A. <u>Summary Judgment Standard</u>

A motion for summary judgment will be granted if after drawing all inferences in favor of the moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed. R. Civ. P. 56(c); *Apalucci v. Agora Syndicate, Inc.*, 145 F.3d 630, 631 (3d Cir. 1998); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir. 1989); *Davis v. Portline Transportes Maritime Int'l*, 16 F.3d 532, 536 n. 3 (3d Cir. 1994); *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue may exist if the record taken as a whole could lead a rational trier of fact to find for the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Under Fed. R. Civ. P. 56(c), the moving party bears the burden of pointing out to the district court an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The court will take the nonmoving party's allegations of fact as true. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).  If the moving party meets its burden, the opposition bears the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

B. <u>Choice of Law</u>

6

The choice of law question in this case is an intriguing one, dominated by the existence of the United Nations Convention on Contracts for the International Sale of Goods ("CISG" or "Convention"), 15 U.S.C. App.

The CISG was ratified by the United States on December 11, 1986 and became effective on January 1, 1988. *See* 15 U.S.C. App. at 332 (1998).  The Convention strives to promote certainty among contracting parties and simplicity in judicial understanding by 1) reducing forum shopping, 2) reducing the need to resort to rules of private international law, and 3) establishing a law of sales appropriate for international transactions.  Caroline Delisle Klepper, *The Convention for the International Sale of Goods: A Practical Guide for the State of Maryland and its Trade Community*, 15 Md. J. Int'l L. & Trade 235, 237 (Fall 1991).  Nations have adopted the CISG to provide for "the orderly conduct of international commerce." *Ajax Tool Works, Inc. v. Can-Eng Mfg. Ltd.*, 2003 WL 223187, *2 (N.D. Ill. 2003).

When two foreign nations are signatories to the CISG, as are the United States and Finland, the CISG governs contracts for the sale of goods between parties whose places of business are in these different nations. 15 U.S.C. App., Art. 1(1)(a); *See Supermicro Computer Inc. v. Digitechnic, S.A.*, 145 F.Supp. 2d 1147, 1151 (N.D. Cal. 2001).  The CISG applies where the contract is silent as to choice of law[7]. *Amco Ukrservice v. Am. Meter Co.*, 312 F. Supp. 2d 681, 686 (E.D.Pa. 2004); *Supermicro Computer Inc. v. Digitechnic, S.A.*, 145 F. Supp. 2d at 1151.

---

[7]  The CISG is a treaty to which the United States is a signatory; thus the CISG is federal law.  Under the Supremacy Clause of the United States Constitution, federal law preempts inconsistent provisions of state law.  When applicable, the CISG preempts Article 2, Sales, of the UCC. Richard E. Speidel, *The Revision of UCC Article 2, Sales In Light of the United Nations Convention on Contracts for the International Sale of Goods*, 16 Nw. J. Int'l L. & Bus. 165, 167 (1995).

The CISG has four parts.  Part II of the CISG governs formation of contracts.  As Valero correctly notes, the CISG doesn't govern in this matter with respect to contract formation and thus with respect to the effect to be given to Valero's confirmation designating New York law. Article 19 of Part II of the CISG addresses the addition of terms to a contract, 15 U.S.C. App. Art. 19.  However, upon ratifying the CISG, Finland declared, in accordance with Article 92(1)[8], that it would not be bound by Part II of the Convention governing formation of the contract. *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 444 (3d Cir. 2003).  Accordingly, because Finland is not a signatory to Part II of the CISG, the CISG does not govern the effect of the choice of law provision contained in Valero's written confirmation.

On the other hand, unless Valero has effectively opted out of the CISG by means of the provision in its confirmation that New York law is applicable, the CISG governs the rights and obligations of Valero and Greeni arising from such contract.  "Although the CISG is plainly limited in its scope (15 U.S.C. App. Art. 4), the CISG nevertheless can and does preempt state contract law to the extent that state causes of action fall within the scope of the CISG." *Asante Technologies, Inc. v. PMC-Sierra, Inc.*, 164 F. Supp. 2d 1142 (N.D. Cal. 2001).

Article 6 of the CISG provides that "[t]he parties may exclude the application of the Convention or, subject to Article 12, derogate from or vary the effect of any of its provisions."  15 U.S.C. App. Art. 6.  The original oral agreement, as negotiated between Valero and Greeni, contained no provision that excluded the application of the CISG.  Consequently, as noted

---

[8] Art. 92(1) states: "A contracting State may declare at the time of signature, ratification, acceptance, approval or accession that it will not be bound by Part II of this Convention or that it will not be bound by Part III of this Convention."

above, the CISG governed the rights and obligations of the parties.  Valero contends that it effectively excluded application of the CISG by means of its written confirmation.

The court concludes, however, that Valero failed to exclude the agreement from the CISG.  This conclusion can be reached by two routes, each arriving at the same destination. First, if under New Jersey law the confirmation effectively amended the original agreement, it nevertheless failed to replace the CISG with New York's UCC, because in the circumstances of this case New York itself would have applied CISG.  Second, under New Jersey law, the substitution of the CISG with New York's UCC materially altered the original agreement and therefore did not become a part of that agreement.

Several federal courts have adopted the first approach, holding that to exclude the CISG a party must not only provide that the law of a particular state will apply, it must also expressly state that the CISG will not apply.

*BP Oil Int'l, Ltd., v. Empresa Estatal Petroleos De Ecuador*, 332 F. 3d 333 (5th Cir. 2003) concerned Petro Ecuador's purchase of gasoline from BP Oil to be transported from Texas to Ecuador.  Petro Ecuador refused delivery asserting the gasoline did not meet the contract's quality specifications.  The final agreement provided, among other things, "Jurisdiction: Laws of the Republic of Ecuador."  The Court of Appeals assumed that this provision unambiguously conveyed the intent to apply Ecuadorian law.

The district court, relying on its diversity jurisdiction, applied Texas choice of law rules, which recognized choice of law provisions in a contract, and determined that Ecuadorian law applied, rejecting BP Oil's contention that the CISG governed.  The Court of Appeals noted that the district court also had federal question jurisdiction by virtue of the CISG, a treaty ratified by

the Senate which created a private right of action in the federal court.  "As incorporated federal

law, the CISG governs the dispute so long as the parties have not elected to exclude its

application. CISG Art. 6." 332 F.3d at 337.  The Court rejected Petro Ecuador's contention that

the contract's choice of law provision demonstrated the parties' intent to apply Ecuadorian

domestic law instead of the CISG, because "[a] signatory's assent to the CISG necessarily

incorporates the treaty as part of that nation's domestic law." *Id.*  "Similarly, because the CISG is

the law of Ecuador, it governs this dispute. '[I]f the parties decide to exclude the Convention, it

should be expressly excluded by language which states that it does not apply and also states what

law shall govern the contract.'" *Id.* at 337 (citation omitted).

      *Asante Techs., Inc. v. PMC-Sierra, Inc.*, 164 F. Supp.2d 1142 (N.D. Cal. 2001) reached

the same result.  Asante, a Delaware corporation, purchased electronic components from PMC,

also a Delaware corporation but having its place of business for purposes of the CISG in British

Columbia, Canada.  The terms and conditions that Asante submitted provided: "APPLICABLE

LAW.  The validity [and] performance of this [purchase] order shall be governed by the laws of

the state shown on Buyer's address on this order." 164 F.Supp.2d at 1145.  PMC's terms and

conditions of sale provided: "APPLICABLE LAW.  The contract between the parties is made,

governed by, and shall be construed in accordance with the laws of the Province of British

Columbia and the laws of Canada applicable therein, which shall be deemed to be the proper law

hereof." *Id.*

      The district court denied Asante's motion to remand, asserting that there was federal

jurisdiction on the ground that the CISG completely preempted state law to the extent that the

CISG governed the contract.  The court held that the parties had failed to exclude application of

10

the CISG simply by their designation of California and British Columbia law, because the CISG is the law of British Columbia and because by virtue of the Supremacy Clause . . . "under general California law, the CISG is applicable to contracts where the contracting parties are from different countries that have adopted the CISG. In the absence of clear language indicating that both contracting parties intended to opt out of the CISG, and in view of Defendant's Terms and Conditions which would apply the CISG, the Court rejects Plaintiff's contention that the choice of law provisions preclude the applicability of the CISG." *Id*. at 1150.

*Ajax Tool Works, Inc. v. Can-Eng Mfg. Ltd.*, 2003 WL 223187 (N.D. Ill 2003) concerned Ajax's purchase of a furnace from Can-Eng. Ajax was an Illinois corporation, Can-Eng an Ontario, Canada corporation. The parties' contract provided that the "agreement shall be governed by the laws of the Province of Ontario, Canada." Holding that notwithstanding this provision the CISG applied, the court stated, "[o]bviously, this clause does not exclude the CISG. Further, although the parties have designated Ontario law as controlling, it is not the provincial law of Ontario that applies; rather, because the CISG is the law of Ontario, the CISG governs the parties' agreement." 2003 WL 223187 at *3.

In its reply Valero argues that because the United States has opted out of Article 1 1(b), that:

> "[the courts in] Asante and Ajax committed two basic errors in applying CISG. First, in relying on the parties' choice of law to lead to a choice of CISG, the decisions failed to recognize that the United States specifically disclaimed Article 1 1(b) of the Convention. CISG Art. 1. Article 1 1(b) applies CISG if the application of private choice of law rules (here, a contractual choice) leads to the application of the laws of a CISG signatory. Because the United States specifically refused Article 1 1(b) it is forbidden to apply CISG on the basis that the parties chose the laws of an American jurisdiction." (Valero Reply Brief at 5).

Although it is true that contracting states may elect not to adopt article 1 1(b) and the United States has opted out of that provision, Valero has misinterpreted the meaning of this opting out. The result of the United States opting out, unless the parties expressly agree otherwise, is that the CISG does not apply to contracts between a United States party and a party with a place of business in a state that has not adopted the CISG. Richard M. Lavers, *Contracts for the International Sale of Goods*, 60-NOV Wis. B. Bull. 11, 11-12 (November 1987)[9]. The United States clearly decided to apply the law of the Convention only to transactions between parties in two contracting states. The United States opting out would have an impact when one state was a contracting state and the other state was not a contracting state. "In cases where Sub 1(b) is relevant the trading partners of the Contracting States are in non-Contracting states." John Honnold, *Uniform Law for International Sales Under the 1980 United Nations Convention*, 86-89 (2d Ed.) (1991). It is clear that the Convention applies when both the buyer and seller are in contracting states, as is the case here (Finland and the United States are both contracting parties to the CISG). The United States's opting out of Article 1 1(b) of the Convention is of no relevance in the case at bar.

Applying the reasoning of *BP Oil*, *Asante* and *Ajax* to the present case, if Valero effectively supplemented the oral agreement to include a provision to the effect that New York law applied, the provision failed to specifically exclude application of the CISG and under New

---

[9] Lavers writes: "the CISG also may apply 'when the rules of private international law lead to the application of the law of a Contracting State,' that is, as when a conflict of laws situation leads to the application of the laws of a state that has ratified the CISG, unless the contracting state has elected against that particular provision of the convention in its instrument of ratification." *Id.*

12

York law the courts, by virtue of the Supremacy Clause, would apply the CISG.

However, this route need not be taken in this case.  The court concludes that Valero's confirmation did not have the effect of amending the original oral agreement.  As noted at the outset the CISG does not govern the formation of the agreement in this case because Finland did not adopt Part II of the CISG governing the formation of contracts.  Resort must be to the conflict rules applicable in a diversity case.

In a diversity action, choice of law of the forum state, in this case New Jersey, should apply when determining what substantive law governs.  *Gibbs ex rel. Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 131 (3d Cir. 2002).  New Jersey has a two-step choice of law analysis.  First, the court determines whether there is any conflict between the law of the interested states.  At the second step, if the court has determined that a conflict exists, it proceeds by conducting an analysis of the competing policies of the states.  The court will evaluate the respective interests of the involved states to determine which state has the most significant interest in governing with respect to the claim. *Erny v. Estate of Merola*, 171 N.J. 86 (2002).  The interested states in this matter are Texas, New York and New Jersey.

C.  UCC §2-207

Each of these states has adopted §2-207 of the Uniform Commercial Code.  Thus it would appear that there is no conflict and that §2-207 governs the question whether Valero's confirmation had the effect of specifying that jurisdiction was in New York and replacing the CISG with New York's domestic law.  This section, which addresses the binding effect of proposed additions to a contract provides:

1) A definite and seasonable expression of acceptance or a written

13

confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

2) The additional terms are to be construed as proposals for addition to the contract.  Between merchants such terms become part of the contract unless:
       (a) The offer expressly limits acceptance to the terms of the offer;
       (b) they materially alter it; or
       (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

N.J.S.A. 12A:2-207.

Greeni did not notify Valero of its objections to the additional term concerning jurisdiction and the governing law within a reasonable time, and the question becomes whether designating jurisdiction and shifting from the CISG to New York law materially alters the original agreement.  In light of the cases concerning the conflict over the applicability of the CISG or domestic law cited above it is difficult to conceive that in an international transaction the termination of the CISG's applicability is not material under §207.  This is emphasized by the important role the CISG plays in international commerce and the great lengths to which the international community has gone to achieve its adoption by the nations of the world.

On a less cosmic level courts have held that a jurisdiction and/or choice of law provision is material within the meaning of §207.  "Forum selection clauses are material terms to a contract." *Cegg, Inc. v. Magic Software Enters., Inc.*, 51 Fed. Appx. 359, 2002WL 31248483 (3d Cir. 2002).  "The clause in Capital's pre-printed Order, by eliminating the choice of law provision, is a term that does 'materially alter' the contract within the meaning of U.C.C. Section 2-207 and therefore no choice of law agreement was ever formed." *Reeves Brothers, Inc. v. Capitol-Mercury Shirt Corp.*, 962 F. Supp. 408, 412-13 (S.D.N.Y. 1997).  "The choice of law

14

provisions constitute a material alteration to the contract, and neither party accepted the other's offer to include the clause.  Therefore, the choice of law provisions did not become part of the contract between the parties." *Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345, 352 (M.D.N.C. 1995).

Particularly in the circumstances of this case, Valero's August 17, 2001 confirmation stating that New York law and jurisdiction would apply constituted a material alteration under §207 and therefore did not become a part of the agreement between Valero and Greeni.  The CISG remained the law governing interpretation and enforcement of their agreement.

D.  Application of the CISG

Valero contends that even if the CISG applies it is entitled to summary judgment on liability.  Article 33 of the CISG provides that "[t]he Seller must deliver the goods: (a) If a date is fixed by or determinable from the contract, on that date."  Greeni failed to deliver during the September 10-20 window.  Further, according to Valero, Greeni breached the new contract providing for a delayed delivery at a reduced price by failing to deliver in accordance with the new time table.

There are a number of factual issues which preclude summary judgment.  There is the question whether Valero rejected Bear G in good faith.  Had Greeni been permitted to discharge the Naptha at Valero's facility rather than having to deliver it by barge, Greeni could have met the time schedule provided for in the second agreement.

There is the question whether under Article 25 of the CISG Greeni's failure to tender the cargo during either the original delivery window or the revised delivery window constituted a fundamental breach of the contract.  Valero contends that in a volatile market such as that

which prevailed here a delayed delivery constitutes a fundamental breach.  Greeni has offered evidence that Valero intended to use the naphtha solely for blending and that Valero already had a large supply of naphtha and would not be able to use the product that Greeni was to deliver for many weeks.

These and other issues require a fuller development of the CISG's applicable provisions and the resolution of factual questions.

### III.  Conclusion

For the reasons set forth above summary judgment on liability is at best premature and Valero's motion will be denied.

_____
                                    /s/ Dickinson R. Debevoise
                                  DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: June 14, 2005