# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

VALERO MARKETING & SUPPLY COMPANY  :
                                                                    :
          Plaintiff,       :     Civ. No. 01-5254(DRD)
                                                                    :
          v.       :     **O P I N I O N**
                                                                    :
GREENI OY and GREENI TRADING OY,      :
                                                                    :
          Defendant.       :
_____ :

Richard H. Webber, Esq.
James A. Saville, Jr., Esq.
Hill Rivkins & Hayden LLP
924 U.S. Highway 9 South
South Amboy, New Jersey 08879-3313
      Attorneys for Plaintiff

Michael G. Davies, Esq.
Vedder, Price, Kaufman & Kammholz, P.C.
805 Third Avenue
New York, New York 10022

Charles Caranicas, Esq.
Vedder, Price, Kaufman & Kammholz, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068

**Debevoise, Senior District Judge**

## I. Facts

      This is an action for breach of contract.  Plaintiff, Valero Marketing & Supply Company

("Valero") is a corporation incorporated in the State of Delaware with its principal place of

business in Texas.  At all times material to this action it leased shore tanks at the Stolthaven

facility located in Perth Amboy, New Jersey, where it blended components purchased from third

parties into various grades of reformulated gasoline.  Defendant, Greeni Trading Oy ("Greeni") is

an international petroleum trading company incorporated under the laws of Finland[1].

In August, 2001, Ilkka Kokko, Managing Director of Greeni and an experienced petroleum products trader, had a stock of naptha to sell.  One of the brokers with whom he communicated was Cees van der Hout of Starsupply Petroleum Feedstocks, Inc., ("Starsupply") in New Jersey.  Van der Hout in turn communicated with Valero's trader, Stuart Burt, who was responsible for Valero's blending operations at Stolthaven.  Van der Hout informed Burt of the characteristics of the naptha being offered and in due course negotiated a contract between the parties.  He dealt with each party, and there were no direct dealings between the parties.  Through him on or about August 15, 2001, the parties agreed that between September 10-20, 2001, Greeni would deliver 25,000 metric tons of naptha to Valero's shore tanks at Stolthaven.  At that time the naptha was in stock in Hamburg, Germany.

The price for petroleum products is volatile, and traders such as Burt work from pricing models in an effort to calculate prices that will provide acceptable profit margins for the products resulting from a given mix.  The price agreed upon in this transaction was ex-ship, ex-duty exchange of futures for physicals against the October NYMEX gasoline less a discount of USDO.1515 per gallon.

The terms of the agreement are reflected in van der Hout's deal sheet and were confirmed in a faxed communication from van der Hout to Kokko.  The confirmation detailed the agreement in terms of, inter alia, product, quantity, quality, timing of delivery (September 10 to 20, 2001) and pricing.  The vessel on which the naptha would be shipped was subject to

---

[1]  A related corporation, Greeni Oy, was originally named as a defendant.  With the agreement of the parties the complaint as against Greeni Oy has been dismissed.

acceptance by Valero's Marine Department ("which shall not be unreasonably withheld") and that title and risk of loss or damage to the naptha would remain with Greeni until the product passed at the flange connection between the vessel's manifold connection and the shore line at the discharge port.

On or about August 17, 2001, Valero sent to Greeni a written confirmation containing similar provisions. Of particular significance in the present case are the provisions for delivery "during the period of 09/10/2001- 09/20/2001" and "from a vessel 'TBN' provided by the Seller which is subject to Buyer's approval and terminal acceptance. Such acceptance shall not be unreasonably withheld." Greeni expressed no objections to Valero's confirmation, and Kokko communicated with ship brokers to obtain a vessel to transport the naptha.

Brokers brought to Kokko's attention the Bear G. He was familiar with the Bear G, having chartered it ten or fifteen times previously to transport petroleum products and having had no problems. In early August 2001, prior to entering into the naptha contract, Greeni and Valero entered into negotiations for the sale of vacuum gas oil ("VGO") by Greeni to Valero. The VGO was to be transported from Europe to Valero's facilities in Corpus Christi, Texas. Greeni nominated Bear G to transport the VGO, and Valero accepted the nomination.

Initially Greeni chartered Bear G for the naptha delivery "subject," giving it a period of time to consider the deal. After confirming that Bear G could be brought into the Port of Hamburg, Greeni on August 29 imprudently lifted the charter without clearing with Valero and thus committed itself. On August 30, Greeni nominated Bear G to Valero. Starsupply informed Valero. Jason Welch, who was in charge of Valero's operations and plant, asked Valero's Lawrence R. Smith to vet the vessel.

3

Smith was Valero's manager of marine operations.  One of his responsibilities was to vet vessels that carried petroleum products to be delivered to Valero, thus ensuring both reliability of delivery and safety both at sea and in port.  The vetting process at Valero was at that time relatively new, and Smith himself had no formal training in vetting.  For several reasons Smith rejected Bear G.  In his testimony he cited Valero's blanket policy of rejecting vessels that were more than 15 years old; Bear G was 20 years old.  Further, it was an oil/bulk/ore ("OBO") vessel, a kind of vessel with which shippers had had problems in the past and the technology of which was dated.

Smith examined a Revised Ship Inspection Report ("SIRE Report") concerning a February 12, 2001 inspection of Bear G.  The Sire Report confirmed the vessel's age and noted some corrosion of the top wing tanks, but overall it was a satisfactory report.

Smith also examined a USCG Port State Information Exchange ("PSIX") Report current as of June 30, 2001.  Smith noted that some of the vessel documents and certifications were due to expire as soon as September 30, 2001.  He also noted an October 29, 2000, problem reflected in the report, and that when Bear G entered the Port of New York on November 16, 2000, fuel oil was leaking into the ballast tanks.  A weld had failed and 30 gallons were released into the tanks, although later recovered.  Temporary repairs were made prior to departure and the report noted that "vessel must make permanent repairs prior to U.S. return carrying oil cargo, to the satisfaction of Class Society."  Smith was not aware whether the repairs had been made.

Smith was also not aware that Valero had recently approved Bear G for a shipment of VGO.  He was aware that approximately a year previously Bear G had discharged a cargo at a Valero facility in Corpus Christi.  He called the facility to ask about that delivery, but no one

4

called him back, and he pursued the matter no further.

Smith completed his vetting in about an hour, basing his decision to reject Bear G primarily on account of its age and Valero's policy of not approving vessels more than fifteen years old. Smith informed Welsh of his decision, and on the same day as the nomination Welsh notified Aija Antola of Greeni that: "we have received your nomination of the vessel 'Bear G.' Unfortunately, this vessel does not meet Valero's criteria for acceptance at this time. We kindly ask that you renominate another vessel for our review."

This decision caused consternation at Greeni. Kokko sought an explanation from Starsupply and directly from Welch. No explanation was forthcoming other than Bear G did not meet Valero's criteria. What the criteria were was never explained. Valero stated that the decision could not be reversed.

Greeni concluded that it could not at that point find a different vessel. Bear G had a capacity of 56,000 tons. The Valero cargo was 25,000 tons. Greeni had naptha in Tallinn, Estonia, of the same grade and quality as the naptha in Hamburg. On August 28 it entered into a sale of a portion of the Tallinn naptha to Northville for delivery in the New York harbor, and negotiations resulted in a September 7 sale of the balance of the Tallinn naptha to Tosco for delivery in the New York harbor. Bear G was to deliver the entire load.

Two circumstances delayed departure of Bear G from Hamburg with the combined load. Greeni had chartered two vessels to carry the naptha from Tallinn to Bear G. One of the two vessels did not have enough hose or the right kind of hose to effect a transfer of the naptha to Bear G. Obtaining the proper hoses consumed two days. An additional two days were consumed by reason of the fact that Greeni had been misinformed about the capability of the facility at

5

Hamburg at which the loading of the naptha on Bear G was to occur.  Two days were required to transfer to another facility and complete the loading.

As a result of these delays Bear G did not sail from Hamburg until September 10, the first day of the delivery window, with an estimated time of arrival in New York harbor of September 21 - a day after the close of the delivery window.  In the event, Bear G encountered a severe storm and was delayed an additional day.

On September 12 Greeni nominated Bear G to Tosco and Northville.  Both buyers rejected Bear G, not because of any deficiency in Bear G, but because its size did not permit it to unload at the Tosco and Northville docks.  The parties agreed that the naptha would be transferred to barges and delivered to the buyers by the barges.  The buyers successfully obtained barges for which Greeni paid.

As between Greeni and Valero, Valero refused to permit Bear G to unload at Stolthaven, and it was apparent that in any event Bear G was not going to arrive within the September 10-20 window.  After discussions through van der Hout, Valero's Burt on September 14 authorized van der Hout to present a take-it or leave-it proposition.  As for the manner of delivery:

> It was stipulated in the contract that the vessel nomination was subject to Valero's Marine Department's approval.  Since Greeni elected to charter the vessel: "Bear G", which was unacceptable to Valero's Marine department the only way to deliver the contracted volume was by lightering barge(s).  Although there was no contractual obligation to do so Valero's operational department agreed that if this was possible to try to locate barges for this operation.  It was, however, made clear that Valero wanted Greeni to ultimately take on the chartering of said barges and didn't want to be held responsible for any operational delays since the barge market has been very tight for quite some time.

As for the time of delivery and price:

> In view of the current e.t.a. of the "Bear G" on September 20, it has become

impossible to make delivery of the naptha within the contractual delivery window.

> In view of these facts Valero is willing to accept the total volume of product
> delivered by Greeni to their terminal no later than midnight on September 24[2].
> For this accommodation the contract price will be adjusted by a discount of
> $0.0175 per us gallon.  After this time Valero is not obligated to take any more
> volume under this contract.  For all barrels delivered on September 20, Valero
> will of course pay the full contract price.

Kokko recognized that it would be very difficult to locate and unload Valero's naptha by lightering operations by the September 24 date, but he felt he had no alternative but to accept the offer.  The barge market was indeed tight, partly for seasonal reasons and partly because of pressures resulting from the World Trade Center catastrophe.  Valero made a few perfunctory efforts to identify barges that Greeni could charter.  Greeni made strenuous efforts from its offices in Helsinki to secure barges but was unsuccessful.  It had secured none by the time that Bear G arrived in the Port of New York and was ready to unload at 3:30 a.m. on September 22.  Had Valero accepted direct delivery it could have commenced delivery to Valero during the afternoon or evening of September 22.

Valero asserts that as a result of Greeni's failure to deliver any naptha to Valero by September 24, Valero was unable to blend naptha with other components and deliver finished gasoline to the market by the end of September.  It was thus unable to execute the sales plan based upon Mr. Burt's calculations made in August.  It instead purchased quantities of Greeni's naptha in late September and early October and blended this product with the components on hand.  Valero then delivered 294,000 barrels (mb) of 87 RFG on various dates in October rather than by the end of September as originally planned.  Mr. Burt testified that being required to

---

[2] In the original modification agreement the date was September 23, but the parties agree that it was understood that the date was September 24.

effect these sales when prices were falling resulted in a loss, computed conservatively, of $246,900.

Greeni effected deliveries to Northville and Tosco in accordance with their agreements. The original contract between Valero and Greeni provided for the sale of 10,642,170 U.S. gallons of naptha (plus or minus 10% at seller's option) priced against October 2001 NYMEX less discount of $0.1515 per gallon.  Greeni sold the naptha originally destined for Valero to the following entities for the following prices and with a claimed mitigation loss (in addition to a claim for demurrage and lightering) as follows:

| Sales | Loss |
|---|---|
| 4,089,855 gallons to Glencore at October 2001 NYMEX less discount of $0.1800 per gallon. | $116,560.87 |
| 4,933,351 gallons to Valero at October 2001 NYMEX less discount of $0.1775 per gallon. | $128,267.13 |
| 1,959,241 gallons to Valero at November 2001 NYMEX less discount of $0.1575 per gallon. | $80,328.88 |
| TOTAL | $325,156.88 |

Valero, charging that Greeni breached the contract by shipping via the rejected Bear G and failing to meet the delivery schedule, sues for the losses it incurred by reason of the failure of Greeni to deliver the 25,000 metric tons of naptha to it between September 10 and 20, 2001, or at least by September 24, 2001.  Greeni, charging that Valero breached the contract by rejecting Bear G unreasonably and refusing to accept the naptha within a reasonable time after the expiration of the window date, sues for the losses it incurred on its sales effected below the contract price.

8

## II.  Jurisdiction and Applicable Law

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) in that the

matter in controversy exceeds $75,000 exclusive of interest and costs and is between a citizen of

a state of the United States and citizen of a foreign state.

In its opinion addressing Valero's motion for summary judgment, the court held that the

rights and obligations of Valero and Greeni arising under the contact are governed by the United

Nations Convention on Contracts for the International Sale of Goods ("CISG"), 15 U.S.C. App.,

Valero Marketing & Supply Company v. Greeni Oy & Greeni Trading Oy, 373 F. Supp. 2d 475

(D.N.J. 2005).

## III.  Discussion

A.  Reasonableness of Rejection of Bear G: The original agreement between Valero and

Greeni provided that the vessel selected by Greeni "is subject to Buyer's acceptance . . ..  Such

acceptance shall not be unreasonably withheld."  The reasonableness of Valero's rejection of

Bear G is a factual question.  Weighing the evidence, the court concludes that Valero's rejection

of Bear G was unreasonable.

While Smith was a completely truthful and knowledgeable witness, he and Valero

proceeded as if they could reject a vessel casually and for almost any articulated reason without

seriously examining the facts as they existed at the time of the decision.  Valero had no

systematic criteria by which to make a judgment other than the general rule that it would not

accept OBOs and vessels that were more than fifteen years old.  Even that was a rule that was

observed only on occasion and dispensed with on other occasions.  Valero had within the past

month accepted Bear G itself for a VGO shipment and had accepted it on a prior occasion.  It had

9

accepted other vessels that were more than fifteen years old, two of them, Regents Park and

Teekay Fair, to transport and discharge naptha cargoes at Stolthaven Terminal in September

2001.

 The reports upon which Smith relied provided no support for his rejection of Bear G.

The SIRE Report overall was a rather favorable report on Bear G's condition.  It is true that the

PSIX report to which he referred described a November 16, 2000, fuel oil leak into the ballast

tank, but the report contained the instruction that the "vessel must make permanent repairs prior

to U.S. return carrying oil cargo, to the satisfaction of Class Society."  It is inconceivable in view

of Bear G's subsequent voyages that such repairs had not been made, and Smith made no effort

during his one-hour evaluation to make inquiry.  One of the voyages had been to Valero's facility

in Corpus Christi, and Smith did not follow up to determine if any problems were detected there.

 Valero attempted to explain away its early August acceptance of Bear G and its August

30 rejection of the same vessel.  It argued that naptha is a more volatile substance than VGO and

therefore a vessel might be acceptable transporting VGO and not acceptable for transporting

naptha.  None of the witnesses, lay or expert, could recall acceptance of a vessel for carrying one

kind of petroleum product and than rejection for carrying another kind.  Even less persuasive is

Valero's rationalization based upon the differences between the Port of New York and the Port of

Corpus Christi.  It argued that Bear G was suitable for Corpus Christi because that port had a

long, wide channel that approached it, and Valero owned its own dock in Corpus Christi.  In New

York, on the other hand, the harbor is crowded and Valero only leases its dock facilities.  It

would seem that these same differences would affect any large vessel, not just Bear G.

 Of the two experts who testified about the reasonableness of the rejection of Bear G,

Greeni's John T. Williams was considerably more persuasive than Valero's Charles Norz.

In rendering an opinion that rejection of Bear G was reasonable, Mr. Norz relied on the SIRE Report, the age of Bear G, the Coast Guard PSIX Report, and also on a report of an explosion that occurred in Bear G's engine room in February 2000.  He had only been advised of one of Valero's two prior approvals of Bear G.  He acknowledged that in the case of damage to a vessel the Coast Guard checks for repairs and had cleared Bear G after the February, 2000, engine room explosion and November, 2000, weld failure.  He acknowledged that classification organizations perform thorough work, and that in August and September 2001 Bear G was in class.  He was not aware of any condition that rendered Bear G unsuitable during those months. He further testified that if Valero had standards for vessel qualification, such as age, they should be applied uniformly.  Mr. Norz's testimony, considered in its entirety, suggested that there was no substantial reason for rejecting Bear G for an August and September, 2001, naptha delivery.

Greeni's expert, Mr. Williams of CWA International Consulting Services of London, was a most persuasive witness.  He had been informed of the details of the transaction between Valero and Greeni and was aware of Valero's rejection of Bear G.  He was asked for his opinion about the suitability of Bear G to transport naptha and vacuum gas oil.

Mr. Williams reviewed Det Norske Veritas's classification of Bear G (renamed Vicky). He noted the deficiencies that were observed in New York harbor on October 29, 2000, and the weld failure in November 16, 2000.  He also noted the correction of these deficiencies and that the vessel was inspected at Galveston on January 17, 2001 and approved to carry out port operations there and was permitted to carry out ship to barge transfers during the current operation without reference to any deficiencies.

Mr. Williams reviewed the documentation that Smith and Mr. Nort reviewed.  In addition he reviewed Bear G's trading history, which involved mostly transporting clean petroleum products during the previous two years.  Of fourteen voyages listed, ten involved carriage of liquid product with similar properties and handling characteristics as naptha, such as condensates and gasolines.  Bear G's equipment included an inert gas producing function as a safety factor to keep the oxygen level low.  This is essential for a vessel that carries a volatile product such as naptha.

Mr. Williams compared naptha and VGO.  In his opinion there was no valid reason to accept Bear G to transport VGO and to reject it for the transportation of naptha if Bear G had an effective inert gas system, which it did, as evidenced by the classification reports and by the fact that the Coast Guard, which closely monitors such systems, admitted it to United States ports.  Valero notes that the inert gas system does not extend to the ballast tanks where gasoline had once leaked, but the cracks that permitted the leaks had been repaired.   In the case of a spill, naptha, because of its volatility, will dissipate more quickly than VGO, which is a much more persistent oil.  Further, requiring lightering operations creates additional risks of a spill.

In Mr. Williams's opinion it was unreasonable to reject Bear G to transport the naptha.  This opinion was not affected by the fact that Bear G was an OBO and was twenty years old.  His opinion is consistent with what a lay person would in any event conclude from the evidence.  Valero undertook not to unreasonably withhold acceptance of the vessel that Greeni nominated.  This obligation requires more than applying internal rules, such as age, which are sometimes applied and sometimes not applied.  It requires some effort to ascertain the current condition of the nominated vessel, an effort that was not made here.  In view of the fact that there has not been

established a valid reason to distinguish between the transportation of naptha and VGO, Valero's acceptance of Bear G in early August and its rejection of Bear G on August 30 cannot be found to be reasonable.

The rejection of Bear G was in violation of the contract between the parties.

B. Late Delivery:   Article 30 of the CISG provides that "[t]he seller must deliver the goods - - - as required by the contract" and in circumstances where a period of time for delivery is fixed in the contract, Article 33(b) further mandates that "[t]he seller must deliver the goods - - - at any time during that period."  Bear G arrived in New York Harbor at 3:30 a.m. on September 22, 2001, and would have been ready to commence discharging its cargo at 2:00 or 3:00 p.m. the afternoon of the 22nd.  Thus even if Valero had accepted Bear G and allowed it to discharge its cargo at the Stolthaven terminal, delivery would have been outside the September 10-20 contractual window.

The naptha to have been delivered during the window period was to have been blended with other components at Stolthaven.  Specifically, Valero intended to use this naptha and other components on hand in its leased storage tanks, such as MTBE, to blend approximately 550,000 barrels of 87 octane reformulated gasoline ("A4" or "87 RFG") and sell it on the cash market prior to September 30, 2001.

Valero claims that as a result of Greeni's failure to perform, it was unable to blend the naptha and deliver any 87 RFG to the cash market prior to the end of September as it had planned.  Valero asserts that it would have been able to sell the blended 87 RFG into the cash market prior to September 30, 2001, and that, as a result of Greeni's failure to perform within the contractual windows of either the original agreement or the modified agreement, it was deprived

13

of the opportunity to sell 87 RFG into the cash market.

The fact that Valero breached the contract when it rejected Bear G had no effect upon the timing of Bear G's arrival in New York harbor, because Greeni proceeded just as it would have proceeded had Valero accepted Bear G.  Bear G arrived outside the window for three reasons: i) it lost two days because it had to transfer loading operations to a different terminal in Hamburg; ii) it lost two days because it had to obtain additional hoses and nozzles in order to load onto Bear G the fuel being sold to Northville and Tosco; and iii) the hurricane encountered in the Atlantic delayed Bear G an additional day.

If Valero had accepted Bear G, the vessel could have proceeded directly to the Stolthaven terminal on September 22 and commenced unloading.  The question must be addressed whether under the CISG this delivery outside the window would have constituted a breach of the contract. If the late delivery would not have been a breach of the contract, then Valero would have had no basis to demand new terms from Greeni, and it would have been obligated to receive the naptha and pay Greeni damages for its failure to do so.  The damages would be computed on the basis of the price specified in the original agreement.

If the late delivery was a breach of the contract, then it must be determined what remedies were available to Valero under the CISG.

Although there are scholarly works that discuss the CISG[3], there is a paucity of case law in the United States courts.  Consequently resort must be had primarily to the language of the CISG itself.

_____

[3]  For example, <u>Four Corners - The Methodology for Interpretation and Application of the UN Convention on Contract for the International Sale of Goods</u>, Bruno Zeller, May 2003.

Chapter II governs the obligations of the seller.  In general "[t]he seller must deliver the goods, hand over any documents relating to them and transfer the property in the goods, as required by the contract and this convention."  As to the time of delivery, Article 33 provides: "The seller must deliver the goods: (a) If a date is fixed by or determinable from the contract on that date."  In the present case the delivery date was "fixed by" the contract - September 10-20, 2001.  Article 47(1) provides that "[t]he buyer may fix an additional period of time of reasonable length for performance by the seller of his obligation."  This is what Valero purported to do by means of the second agreement.

The fact that Greeni did not deliver (and even if Bear G had been accepted, would not have delivered) the naptha by the agreed upon date, does not end the inquiry.  Article 49 sets forth the circumstances when a buyer may declare the contract "avoided."[4]

> Article 49
>
> (1) The buyer may declare the contract avoided:
> (a) If the failure by the seller to perform any of his obligations under the contract or this Convention amounts to a fundamental breach of contract; or
> (b) In the case of non-delivery, if the seller does not deliver the goods within the additional period of time fixed by the buyer in accordance with paragraph (1) of article 47 or declares that he will not deliver within the period so fixed.

In the present case Article 49(1)(b) would not have provided grounds for Valero to avoid the contract, because, except for Valero's wrongful rejection of Bear G, Greeni could have, and undoubtedly would have, delivered the naptha within the additional period of time (September 24) fixed by Valero.  Valero was entitled to avoid the contract for failure to deliver within the September 10-20 window only if the failure to do so amounted "to a fundamental breach of

---

[4]  The term "avoided" is used in CISG as distinguished from "cancelled" or "terminated."

contract."

A "fundamental breach of contract" is defined in Article 25 of the CISG:

> A breach of contract committed by one of the parties is fundamental if it results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract, unless the party in breach did not foresee and a reasonable person of the same kind in the same circumstances would not have foreseen such a result.

Valero introduced evidence concerning the volatility of petroleum product prices.  Stuart Burt described the complex calculations which he undertakes to establish the price he will pay for the various components of the blend that he proposes to prepare from the various component products.  Valero produced evidence supporting its contention that Greeni's failure to deliver naptha either within the original window or by September 24 caused Valero to sell 87 RFG into the cash market.  Valero faced a falling price, and the delay pushed its sale of the mix from the September market into the October market resulting in a heavy loss.  If that were all that there were to the scenario, that is, that Greeni's non-delivery caused these loses, Greeni's breach would be deemed fundamental.  It would have resulted in such detriment to Valero as to deprive it of what it was entitled to expect under the contract, and Greeni and a reasonable person in the petroleum industry would have foreseen such a result.

But the foregoing does not reflect what actually happened in this case.  The delay attributable to Greeni did not stretch on into September and October.  Rather, the delay attributable to Greeni is at most a two day delay.  It was ready and able to effect delivery of the naptha on September 22 and would have done so had not Valero prevented delivery by wrongful rejection of Bear G.  Had delivery been effected on September 22 the litany of horrors Valero described in its post trial brief would not have taken place.  Valero could have commenced

16

mixing and using the supplies of naptha it already had on hand; the naptha on Bear G would have

been available almost immediately thereafter;  and Valero could have comfortably introduced its

87 RFG into the September market.  Confirmation of this conclusion is found in the fact that

Valero was willing to take delivery as late as September 24, albeit at a somewhat reduced price.

Mr. Burt testified had such a delivery been made, he could have fully met his plan:

> Q.  And based upon your experience in the blending
> operation, are you confident that [if] the cargo arrived by
> the 24th [of September] you would have been able to blend
> and deliver by the end of the month?
>
> Mr. Burt: In my experience, in this case, it was six days.  In
> my experience, six days is plenty of time to finish a
> gasoline blend and make delivery, yes.

(Tr. 79; see also Tr. 139-140).

Thus Greeni's two-day delay in delivering the naptha was not a fundamental breach and

did not give Valero the right to avoid the contract under Article 49(1)(a).   Further, under Article

49(2)(b) of the CISG, the buyer may declare the contract avoided "If the seller does not deliver

the goods within the additional period of time fixed by the buyer in accordance with paragraph

(1) of Article 47 or declares that he will not deliver within the period is fixed."  Paragraph (1) of

Article 47 permits the buyer to "fix an additional period of time of reasonable length for

performance by the seller of his obligations."

However, when granting the extension of time, the buyer "is precluded not only from

avoiding the contract but also from resorting to such remedies as demanding a price reduction.. ."

Nachfrist was ist?  Thinking Globally and Acting Socially; Considering Time Extension

Principles of the U.N. Convention on Contracts for the International Sale of Goods in Revising

the Uniform Commercial Code, John C. Duncan, Jr., Brigham Young University Law Review (2000) 1363-1411, at 1384.  Further, "[t]he buyer may not claim avoidance or price reduction as long as the additional period of time lasts..."  UNCITRAL Digest, Art. 49, ¶ 8.

In summation, Valero breached the contract by unreasonably rejecting Bear G.  As a consequence Greeni is deemed to have been ready, able and willing to deliver the naptha when Bear G arrived in New York Harbor on September 22, 2001.  Greeni was in breach of the contract by failing to effect delivery within the September 10-20 window.[5]  The breach, however, was not fundamental and did not enable Valero to avoid the contract.  Valero did not have the right to demand that Greeni enter into a new contract.  The second contract is of no effect and the parties are bound by the original contract.  Valero is entitled to recover any damages it would have suffered from a two day delivery delay (and none have been shown), and Greeni is entitled to recover damages it incurred as a result of Valero's failure to accept and pay for the naptha in accordance with the contract and any other damages it suffered by reason of Valero's wrongful failure to accept Bear G.

C.  Damages: Greeni computes its damages as follows:

| Sales | Loss |
|---|---|
| 4,090,855 gallons to Glencore at October 2001 | $116,560.87 |

NYMEX less discount of $0.1800 per gallon.

---

[5]  The Court rejects Greeni's force majeure defense.  With the possible exception of the storm, the circumstances upon which Greeni relies were not impediments beyond Greeni's control and which it could not reasonably have been expected to take into account within the meaning of Article 79(1) of the CISG, and in any event Greeni did not give the notice required by Article 79(4).

18

| 4,933,351 gallons to Valero at October 2001 | $128,267.13 |
|---|---|

NYMEX less discount of $0.1775 per gallon.

| 1,959,241 gallons to Valero at November 2001 | $80,328.88 |
|---|---|

NYMEX less discount of $0.1575 per gallon.

**Other Costs**

| Lightering charges | $77,867.70 |
|---|---|
| Demurrage charges (settlement plus fees and costs) | $52,787.05 |
| **Total Damages** (not including interest) | $455,811.63 |

Valero objects to Greeni's computation of mitigation damages of $325,156.88 and proposes an alternative in the event it were assumed that the prices set forth in the August 15, 2001, agreement were applied. The actual amount that Greeni received as a result of its three mitigation sales was $4,888,331.42. If Greeni had delivered the cargo by September 24, based upon the August 15 agreement, the approximate price would have been 48.12 cpg. Greeni would have delivered 10,642,170 gallons to Valero and the total amount it would have realized would have been $5,121,012.20. The difference of $232,680.78 would be the amount of damages. Valero contends that the standard against which damages should be measured, however, is not the price set forth in the August 15 agreement but, rather, the price set forth in the September 14 agreement. On that basis, the loss would be $46,442.81. As explained above, for at least two reasons Valero did not have the right under the CISG to demand a reduction in price. The delay in delivery was not a fundamental breach, and consequently, Valero was not entitled to avoid the contract under Article 49. When granting the extension of time under Article 47 (1) Valero was not entitled to insist upon a price decrease.

Valero's computation of mitigation damages applying the August 15 agreement figures is

19

the more reasonable appraisal, and mitigation damages in the amount of $232,680.78 will be awarded.  To this will be added lightering charges in the amount of $77,867.70.  They would not have been incurred had Valero not rejected Bear G.

Had Greeni incurred extra demurrage charges because of the rejection of Bear G and the resulting extension of time of retention of the vessel it would be entitled to recover those extra charges.  However, the charter party, the demurrage invoices and the London Arbitration Award each demonstrates that Greeni Oy and not Greeni Trading Oy was the charterer of Bear G and entitled to the claim on account of demurrage.   It did not pursue the demurrage claim in this action and there is no evidence that it assigned the claim to Greeni.  Therefore, that element of the damage claim will be rejected.

The damage award will consist of $232,680.78 for mitigation damages and $77,867.70 for lightering charges for a total of $310,548.48.

### IV.  Conclusion

For the reasons set forth above judgment will be entered in favor of Greeni and against Valero on Valero's complaint and judgment will be entered in favor of Greeni and against Valero on Greeni's counterclaim in the amount of $310,548.48 together with prejudgment interest and costs.  The court will file an appropriate order.

                                            **  /s/ Dickinson R. Debevoise  **

Dated: April 4, 2006                          DICKINSON R. DEBEVOISE
                                                U.S.S.D.J.